CALIFORNIA PACIFIC TITLE & TRUST COMPANY (a Corporation), Respondent, v. CROCKER FIRST NATIONAL BANK OF SAN FRANCISCO (a Corporation), Appellant.

Redman, Alexander & Bacon and Alfred B. Weiler for Appellant.

McCutchen, Olney, Mannon & Greene for Respondent:

SPENCE, Acting P. J.—Plaintiff brought this action to recover the sum of $12,559.25, alleged to have been the balance due to plaintiff as a depositor in the defendant bank. The cause was tried by the court sitting without a jury and from a judgment in favor of plaintiff defendant appeals.

The defendant bank came into being as the result of a consolidation and the name of the plaintiff corporation was changed during the time referred to herein but neither the consolidation nor the change of name is material here, so we may simply refer to the institutions involved as plaintiff and defendant. In 1922, plaintiff issued a check on the defendant bank in said sum of $12,559.25 payable to "Mary Baldwin Wood, Extrx., and Baldwin Wood, Extr., of the estate of William Sidney Wood, dec'd." It is this check which is the center of controversy. Said check was indorsed by Baldwin Wood by signing the names of both payees in the same manner as said names appeared upon the check and he thereafter deposited the same in an account carried in the American National Bank in the name of "Estate William S. Wood, Deceased." This estate account was a very active account, the funds in which were subject to withdrawal upon the signature of Baldwin Wood alone. The record does not disclose what, if anything, was done with the money received by Baldwin Wood in payment of this particular check after said money was placed in the last-mentioned account. Mary Baldwin Wood testified "The check was not paid to me," but it also appears from her testimony that Baldwin Wood regularly deposited large sums in her personal account from 1908 until his death, which occurred some time subsequent to 1925. She did not know the exact source of the funds so deposited, but testified, "I got enough to spend seven or eight hundred dollars a month from 1908 until his death."

It was the theory of plaintiff that the indorsement of said check in the manner described constituted forgery on the part of said Baldwin Wood and that plaintiff was en-

titled to judgment against the bank for the full amount represented by said check. This action was not commenced until 1928, being six years after the payment of said check by the defendant bank. The bank defended upon the ground that all money on deposit had been paid out upon plaintiff's order, and the defendant bank further pleaded the statute of limitations. In other words, the bank took the position that the indorsement was not forged but was an authorized indorsement, and further took the position that even if the indorsement was forged, plaintiff's claim was barred. The trial court found against the bank on both of these defenses and gave judgment in favor of plaintiff for the full amount of the check.

On this appeal the defense of the statute of limitations is not urged, for it is now well settled that under the statute in force at the time of the commencement of this action this defense was not available to appellant. (*Atwell* v. *Mercantile Trust Co.*, 95 Cal. App. 338 [272 Pac. 799]; *Merchants Nat. Bank* v. *Continental Nat. Bank*, 98 Cal. App. 523 [277 Pac. 354].) ▪ Appellant's main attack is therefore directed at the findings of the trial court to the effect that said indorsement was unauthorized and forged. We will therefore briefly set forth the evidence relating to this issue which is found solely in the testimony of Mary Baldwin Wood.

William Sidney Wood died in 1908 and shortly thereafter his widow, Mary Baldwin Wood, and his son, Baldwin Wood, were appointed executrix and executor respectively of his will. The proceedings in the probate court were apparently still pending at the time this litigation was commenced in 1928. It is quite evident that Mrs. Wood relied entirely upon her son and paid little, if any, attention to the estate affairs. Shortly after being appointed executrix she went to Europe and subsequently made two other trips there. She also spent two years in the Orient and later she lived in New York for a period of two years. We quote the following excerpts from her testimony: ''After my appointment I qualified as executrix, but I have not been acting as such because I have been out of town so much. . . . I signed a power of attorney after my husband's death. I gave my power of attorney to my son. I think it was about when I went abroad. . . . I gave the power of attorney to my son

so that he could handle all of my affairs—everything. . . . The only paper that I ever signed after my husband's death was that one power of attorney. . . . Part of the estate was what they called the Wood Building at Merchant and Kearney Streets. I never signed any papers in connection with leases for that estate, my son entirely attended to that. I suppose he told me he received rents, but I never knew. I had enough to live on from month to month, and that was all that was necessary. My son paid me the money to live on through the Crocker National Bank, and I understood that that was coming from the estate. I do not remember signing any papers in connection with the business of my husband's estate at all. I took no part in the business of the estate at any time—never. The last time I had to do with the estate was the time I was in court before Judge Coffey—just after my husband died. I knew that all that I had to live on came from the Wood Building and possibly other sources coming into the estate. It came in to my son. I had not the slightest objection to his collecting this money and handling it. My son never paid me anything. I went to the Crocker Bank and drew out the money myself. My son never made me a personal payment at any time. He had all my collaterals. When I went abroad I gave him the collaterals and whatever monies I drew were monies that were in the Crocker Bank and I drew them out on my check. They were put there by my son from various sources. It was the estate property that my husband left to us. When I drew money from the Crocker Bank I signed my checks and handed them in and got the money. The account in the Crocker Bank was in my individual name alone, Mary Baldwin Wood, not as executrix. . . . I left everything to my son Baldwin to take care of. . . . I was not a business woman and just naturally left it to my son. I trusted him implicitly in that matter and that was the situation throughout the whole matter. . . . None of those claims were approved in my handwriting; never approved by me in the slightest way. He paid them and that was sufficient. I consented that they should be paid. I do not remember if there were proceedings in 1909 when some stocks and bonds were distributed to me, some to my son, and some to the trust company for Mrs. Welty, because I had my own stocks and bonds. I think that I got

some stocks and bonds which were part of the estate immediately after my husband died . . . I never got any money from my son or from the estate in any other way than through the Crocker Bank in the way I have described. He never gave me any check on an account in the American National Bank. I never knew anything about the American Bank. I did not know of the existence of an account there. I never discussed with my son where he was putting the money that he got from the rents of the Wood Building and the question never came up. . . . I knew that my son was collecting the rents from the Wood Building. I knew he was collecting the coupons coming off the bonds and the interest coming in on the stocks and I raised not the slightest objection to that. . . . This money that was paid into the Crocker Bank by Baldwin Wood that I could draw on was from the securities that were distributed to me and also, perhaps, so far as I know, the rents from the real property in the estate. The building and everything all went into one and Baldwin handled it all. I thought I was getting half the income from the building and all the income from my personal securities which were distributed to me and which I gave him to handle. . . . I was perfectly satisfied all along to have Baldwin handle everything. . . . My son paid me from time to time through the Crocker Bank in the way I have described up to his death. I got enough to spend seven or eight hundred dollars a month from 1908 until his death.'' When asked how many times she talked to her son about the estate she answered, ''I merely trusted him to attend to it; that was all.''

In view of the foregoing testimony we believe that the finding of the trial court that the indorsement of the name of Mrs. Wood on the check in question was not made ''by or with her authority'' is contrary to the evidence. Her evidence to the effect that she did not indorse the check, had never seen it, and did not know of its existence is in no way in conflict with the testimony set forth. The same may be said of her statement that she did not ''tell him'' he could sign her name as executrix, and we may further note that her bald conclusion that she did not give Baldwin Wood authority to represent her is negatived by the facts to which she testified. Much is said in the briefs regarding the question of whether one of two executors may act for

both under the circumstances before us. On this subject there appears to be a conflict of authority and the parties are not agreed upon the rule in this jurisdiction in view of the provisions of section 1355 of the Code of Civil Procedure then in force. That section provided: " . . . where there are two executors or administrators, the act of one alone shall be effectual, if the other is absent from the state, or laboring under any legal disability from serving, or if he has given his co-executor or co-administrator authority, in writing, to act for both . . . " A discussion of the general question is unnecessary here, for while it is admitted that Mrs. Wood was neither absent from the state nor under any legal disability at the time the check was indorsed, we believe that Baldwin Wood had ample authority in writing to indorse the check. If the check had been made payable to Mrs. Wood individually there could be no question regarding the authority of Baldwin Wood to indorse her name thereon by virtue of the power of attorney, and there is respectable authority for the proposition that the added words were mere *descriptio personae* and should be treated as susplusage. (*Abney* v. *Citizens' Nat. Bank,* (Tex. Civ. App.) [152 S. W. 734]; *Burrell* v. *Kern,* 34 Or. 501 [56 Pac. 809]; *Litchfield* v. *Flint,* 104 N. Y. 543 [11 N. E. 58]; *First Nat. Bank* v. *Collins,* 17 Mont. 433 [43 Pac. 499, 52 Am. St. Rep. 695]; *Roger Williams Nat. Bank* v. *Groton Mfg. Co.,* 16 R. I. 504 [17 Atl. 170]; *Kennedy* v. *Gelders,* 7 Ga. App. 241 [66 S. E. 620]. See, also, Story on Promissory Notes, 7th ed., sec. 63; Daniels on Negotiable Instruments, 6th ed., sec. 262.) But treating the indorsement of the check as an act to be done in her representative capacity, it is clear from the provisions of the section above quoted that the authority to perform that act on her behalf as executrix could be delegated to her co-executor. Under the terms of said section no particular form of writing was required. In our opinion the power of attorney which she stated was given to her son so that he could handle "everything" was sufficient authority in writing to authorize him to act for both of them in their representative capacities in executing the indorsement. We therefore conclude that said indorsement of the check by Baldwin Wood in the manner described was authorized by Mary Baldwin Wood and that it did not constitute a forged indorsement.

Citing section 1095 of the Civil Code, respondent apparently takes the position that if the power of attorney is relied upon, Baldwin Wood was required to sign his mother's name as principal and his own name as her attorney-in-fact. That section, however, refers only to instruments transferring an estate in real property and is inapplicable here. (*Flat Top Nat. Bank* v. *Parsons,* 90 W. Va. 51 [110 S. E. 491]; 2 C. J. 673, and cases cited.)

In view of the conclusions which we have reached it becomes unnecessary for us to consider appellant's further contentions that respondent's claims were barred by accounts stated and that respondent failed to show that it had suffered any loss through the payment of the check upon said indorsement.

The judgment is reversed.

Sturtevant, J., and Goodell, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 27, 1933, and an application by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 26, 1933.

[Civ. No. 8866.  First Appellate District, Division Two.—April 28, 1933.]